# EXHIBIT B

In the Matter of the Arbitration

between

PAN OCEANIC MARITIME, INC.,
as Disponent Owners of the KM IMABARI

and

RSUSA, LLC,
as Charterers

Under a Charter Party dated September 9, 2009:

**FINAL AWARD**
July 2, 2010

Before:        A.J. Siciliano
Klaus C.J. Mordhorst
Manfred W. Arnold

Appearances:      Blank Rome LLP
for and on behalf of Pan Oceanic Maritime, Inc.
by Thomas H. Belknap, Jr., Esq.

Steven C. Reynolds
Chief Executive Officer
RSUSA, LLC
(a wholly-owned SCR Trust Company)

## INTRODUCTION

On December 20, 2009, as chairman of the panel, I sent the following message to

Mr. T. Belknap, Mr. S. Reynolds (with a copy to law@rsusa.org) and Messrs. K.

Mordhorst and A.J. Siciliano, the party-appointed arbitrators:

*I refer to Mr. Mordhorst's email of December 18 confirming my appointment as third arbitrator and chairman for procedural matters.*

*In order to facilitate communications, I should appreciate if Mr. Reynolds could please confirm that RSUSA will handle this arbitration in house; also please let me know who will serve a point person for RSUSA and Pacific Coast Minerals S.A. in this arbitration. The parties are requested to direct all future correspondence to me with copies to my fellow arbitrators and opposing counsel.*

On December 22, 2009, Mr. Reynolds responded:

*. . . we ask for swift action and award as we are confident that the evidence in this case will be evident and clear cut as to Panoceans [sic] breach. RSUSA has suffered enourmous [sic] damages.*

*RSUSA will be represented by myself with assistance being provided by two of our in house lawyers. We reserve the right at any time to bring in outside counsel though we doubt it will be needed.*

*Please send all communications to me with law@rsusa.org and ops@rsusa.org in copy. Our legal team will and I will respond quickly.*

*This is a very simple case in which the very honor of chartering has been destroyed by Panocean [sic] and the actions of its employees! RSUSA adhered to the fixture terms at all times and as the evidence will show Panocean [sic] violated and disregarded the terms as if they never existed. This resulted in millions of dollars in losses to RSUSA and its own mining company.*

*We leave this case in the hands of this experienced Tribunal. . . .*

On December 24, 2009, Mr. Reynolds wrote as follows:

*This is a very simple case. RSUSA never repudiated our Voyage Charter. The evidence will clearly show the incredible violations of the very terms and conditions of our Fixture Note. We have evidence, mountains of it, as well as phone recordings of all conversations with Panocean [sic] as RSUSA always records the conversations. Multiple times RSUSA invited the Master of the Vessel to come on shore and see, touch and feel the 70,200 metrics tons of iron ore we indeed had ready to load. The core problem was with our buyer and we informed Panocean [sic] of this issue multiple times. They refused to come on shore, appointed a protective agent without prior approval and in direct violation of our Fixture Note and listened to rumors instead of facts. We pointed this violation out to Panocean [sic] and they immediately withdrew the protective agent. We also told them that Mr. Stephen Casey with Anacopa (the protective*

*agent appointed) had a real bias towards RSUSA as we did not award them the agency business to begin with and while they provided the trucking and stevedores for the first vessel we loaded they attempted to blackmail RSUSA and even stopped our loading in violation of the contract. We disclosed this to Larry as well. Even after they stated they withdrew they continued to consult in which we have obtained emails from Annacopa [sic] to Panocean [sic] and vice versus.[sic]*

*That is clear. In addition we clearly understood and adhered to the terms and conditions of the C/P as it was our terms and Panocean [sic] accepted. As the despondent owner of the vessel on a voyage basis Panocean [sic] refused to honor the terms and conditions. It is not uncommon for a vessel loading or discharging Iron Ore to wait 3/6 weeks. With that being stated Larry with Panocean [sic] has attempted to contact me directly to discuss this case. He even stated to Mr. Stephen Druhot on a phone conversation that he knew his actions were an extreme violation.*

*Our damages are in millions and we intend to protect our reputation and defend our honor against all parties that choose to slander, defraud or damage our companies. We are insured at the highest levels by the RAETS CLUB and have FDD insurance. We will honor and comply with the final decision of this Tribunal and trust that Panocean [sic] will as well. We are sure after consulting with our outside counsel and inside counsel that Panocean [sic] will owe RSUSA, LLC over US$9 million in damages and loss of business.*

*We will NOT settle and we want justice and we will show the shipping world that we will not tolerate injustice. This is not about money to my family of companies this is about justice. We will get it as we are honest and correct. Should this Tribunal see it any other way and state that RSUSA owes Panocean [sic] money we will pay in one hour the award.*


## PROCEEDINGS

Rather than receiving information in a piecemeal and unconnected fashion, the

panel directed counsel for Owners to submit Pan Oceanic's claim statement, following

which, RSUSA would be given adequate time to respond.

4

On January 19, 2010, counsel for Pan Oceanic submitted a brief together with 43 exhibits. On February 2, the panel inquired of Charterers when they could expect to receive their submission. Mr. Reynolds responded promptly:

*We are working on this . . . . We will attempt to provide over the next 14 days our entire opening brief, response to Claimants [sic] submissions as well as our full Counterclaim. In addition we are waiting for all our clients and witness to advise us of two dates that they would all be available to travel to New York City for the oral hearing. We would like to hold this in our offices and will advise when appropriate as to our location in Manhattan.*

The panel set a deadline of February 22 for Mr. Reynolds' response, with which he did not comply. On February 26, the arbitrators wrote to Mr. Reynolds:

*The panel has received your emails, and whereas we may be sympathetic with the complications in your personal life, we do not wish to be part of these types of exchanges. Therefore, we are not interested in contacting your lawyer . . . on the substance or extent of your family affairs.*

*Despite your assurance, starting in the early days of January, to promptly address the merits of the claims and to arrange for payment into the escrow account, we have not seen any progress. Instead, you have ignored the panel's directions.*

*Considering your insistence that the panel should copy numerous email addresses, including i.a. law@rsusa.org and fdd@rsusa.org, timely and focused responses should have been forthcoming considering the indicated support staff. The panel finds it appropriate also to comment on your continued questioning of the amount of security requested by us. This is not a matter which is open for discussion – it represents a directive by the panel. As I stated in my January 2 email, "The amounts requested are not reflective of the panel's ultimate fees or the allocation thereof." The amounts requested also take into account that there may be an uneven allocation of the panel's fees and expenses against the parties. Any balances, after settlement of the panel's fees, will be returned to the respective depositor, together with any accrued interest.[1]*

*As in all ad hoc arbitrations, this matter is controlled by the panel and not the parties. The arbitrators will ensure that the rights of both parties are properly*

---

[1] Pan Oceanic promptly complied with the panel's request on January 7, 2010. Despite continued assurances, RSUSA did not arrange for the requested transfer.

*protected and that fairness is applied at all times; however, these expectations are
also premised upon the conduct of the parties and their respect of the arbitral
process and the rights of their opponents.*

*You have requested an extension of ten days, and we will grant this request and
expect to receive Charterers' submission not later than **March 8, 2010** (close of
business). In the meantime, we grant Mr. Belknap leave to brief his motion
previously raised that Charterers' defense should be stricken for failing to comply
with the panel's prior orders. In the event Mr. Reynolds does not comply with
the March 8 deadline, the panel will review and decide on Mr. Belknap's
application.*

On March 7, the panel received a ten-page email[2] captioned, "Charters's [sic]

Response and Counterclaim;" the accompanying cover note stated that "RSUSA's legal

team will make hard copies of the attached documents as well as the 122 exhibits[3] and

send them to all parties concerned. We will forward the airway bills once sent." FedEx

tracking numbers were provided, which, however, were invalid.

On March 22, the panel advised Mr. Reynolds and Mr. Belknap as follows:

*To date, despite the numerous assurances over the last 14 days, the arbitrators
have not received the hard copy of Mr. Hirsh's brief nor the exhibits 1-122. If
these documents are not in the possession of Mr. Belknap and the panel by
Friday, March 26, 2010, we will grant Mr. Belknap an opportunity to address
the then-existing record with rebuttal. At that time, we will close the evidentiary
phase of the arbitration, proceed to deliberate the matter and render a decision
based upon the submissions before us.*

*The panel would also appreciate an update on Charterers' efforts to fund the
escrow account.*

On March 25, Mr. Reynolds advised the panel that the packages were sent by

USPS. On March 27, the panel acknowledged receipt of the hard copy submissions. On

---

[2] The email was signed "Mr. Gary Hirsh RSUSA Counsel." The Response and Counterclaim was not
signed by a named individual, but carried the printed legend "RSUSA Counsel."
[3] In fact, there were not 122 exhibits, bur rather a compilation of 122 unmarked and generally unidentified
pages.

April 1, Owners submitted a Reply Brief together with an additional exhibit and an affidavit in support of Pan Oceanic's claim for costs and fees.

On April 3, the panel wrote to the parties and offered the following comments:

*The panel has carefully reviewed the most recent exchanges in connection with the briefs submitted. We make the following comments:*

- *In the April 1 email (3:05 pm), Mr. Reynolds states, "Obviously they did not translate the documents from the Government or the Newspapers . ...." The arbitration is being conducted in New York and in English, and, as such, the burden to have the documents translated from Spanish to English rests with Mr. Reynolds to enable the panel to take judicial notice of the public documents. Therefore, if Charterers want the panel to consider the foreign language exhibits, translations should be provided to the arbitrators and also to Mr. Belknap.*

- *In the April 1 email (4:24 pm), Mr. Reynolds states, "If the Tribunal sees no need then we rest our case . . . ." The determination of when a party has fully and sufficiently briefed and supported its case by witness statements and/or documentary evidence must be made by the party and cannot be made by the panel.*

- *The arbitrators can and will establish schedules for the orderly conduct of the proceedings, ensuring that each party gets its proper turn. On the other hand, during the proceedings, the panel does not take a position or express an opinion on a party's qualitative and/or quantitative submissions, but reserves such judgment for the deliberation process after all arguments and supporting evidence have been received from the parties.*

*In order to ensure that an even playing field is maintained and the parties have had a full opportunity to present their positions, the panel grants Mr. Reynolds until April 15, 2010 to supplement or restate his position and arguments. Thereafter, Mr. Belknap will have until April 26, 2010 to make any response, if he so desires.*

*The panel will close the record by 17.00 on April 26, 2010. We will not entertain any extensions or modifications to this schedule and we will not consider any submission made beyond the deadline established.*

Promptly, on April 3, Mr. Reynolds acknowledged the instructions and advised that he would have the documents translated as they were critical to RSUSA's response and that Charterers would further supplement their position prior to April 15.

Since Charterers failed to submit the promised translations or the aforementioned "further supplement" and Owners' counsel stated that he did not need to make further submissions, the arbitrators advised the parties on April 16 that the evidentiary part of the arbitration was completed and that we would proceed to deliberate the issues and render a decision in due course.

## BACKGROUND

Based upon the record before us, Pan Oceanic had chartered-in the KM IMABARI for a trip time charter with an "abt 55-60 days WOG" duration to cover a voyage from Mexico to China. The hire was $19,500 per day for the first 40 days and $20,000 per day thereafter.

Against this charter, Pan Oceanic fixed the vessel on September 9, 2009 on a sub-details basis to RSUSA for a voyage from one safe berth, one safe port Lazaro Cardenas and one safe berth, one safe port Manzanillo (Mexico) to one safe berth, one safe port China in Charterers' option. The cargo was to be 70,000 m/t iron ore in bulk, 10% more or less in Owners' option. The laydays were October 2-12, 2009 and the freight rate was agreed at $30.75 per m/t FIOST basis two to one. The agreed demurrage rate was $20,000 both ends and dispatch was payable at half the demurrage rate for laytime saved both ends. Item 23 of the fixture recap provided that the fixture was based upon

the RSUSA GENCON Form of charter party with agreed amendments. Arbitration was agreed to be in New York, pursuant to the Rules of the SMA and in accordance with Title 9 of the United States Code and the Maritime Law of the United States. The fixture, as per Item 11, provided for Charterers' agents at the loadport (Mexshipping Agencia SA de CV); Item 20 stated that an address commission of 2.5% was due plus a brokerage commission of 1.25% payable to ISC.[4]

Prior to vessel's arrival, a series of message were exchanged between the parties concerning a number of issues: the amendment of the laycan to commence on October 1, which was declined by Charterers; the quantities and grades to be loaded at Lazaro Cardenas and Manzanillo; stowage and separation and the airdraft restriction at Manzanillo. The vessel was instructed to proceed to Manzanillo, as the sole loading port with the agreed reduced freight rate of $29.75.[5]

The KM IMABARI arrived at Manzanillo on October 1, 2009 and tendered her Notice of Readiness (NOR) at 1300 local time, declaring a cargo requirement of 70,200 m/t.[6] The Master tendered a second NOR, on a without-prejudice basis, for October 2, 2009 at 0001 local time.[7] The NOR was accepted by Mexshipping on October 2 at 0800.

The record shows a message from the Owners on October 2 requesting the Master to monitor and record the weather conditions from arrival through completion

---

[4] ISC (International Services Corp.) was identified by Mr. Reynolds in his January 4, 2010 email as follows: *Mail at ISC is Mr. Stephen Druhot who is our agent in Washington DC that fixed the vessell* [sic] *on our behalf and handled all communications.*

[5] Owners' Exhibit 4 at p. 20.

[6] Owners' Exhibit 5 at p. 1.

[7] Owners' Exhibit 5 at p. 3.

of loading and ensure that they were properly reflected in the Statement of Facts.[8] According to earlier indications, the vessel was scheduled to berth on October 8. In response to Owners' inquiries, ISC advised that because of a 9" rainfall, trucks were prevented from delivering cargo to the terminal and, therefore, loading would only commence on October 10 or 11. The message also included the promise that "as a special gesture of good will to Pan Oceanic by RSUSA, all loading demurrage will be paid at the same time as the ocean freight."[9]  On October 9, still without details about vessel's loading prospects, Owners sent an invoice for detention for the period October 2-12, 2009 in the amount of $227,090.[10]  On October 12, ISC advised that Charterers expected the vessel to berth on October 14. Mexshipping reported on the same day that the berthing prospects were not yet confirmed by the Shippers and that the cargo was not ready. This notice was followed by a message on October 15 that, according to Shippers, 50,000 m/t of cargo was available at the mine (approximately 25 km away). On October 16, ISC confirmed a telephone conversation of the prior day, advising that the iron ore was ready to load with berthing expected in the morning of October 18 after the current vessel (GLORY GUANZHOU) had vacated the loading berth. It appears that on October 16, a meeting with the port authorities took place where it was stated that the cargo for the KM IMABARI was not ready, that the PANAMAX RIDE would be the next vessel in line and that probably the KM IMABARI cargo would start moving into the port on October 18. In the absence of any update,

---

[8] Owners' Exhibit 6.
[9] Owners' Exhibit 8 at p. 1.
[10] Owners' Exhibit 9 at pp. 2-3.

Owners sent a revised Detention Invoice in the amount of $499,598 for the period October 2-24, 2009.[11]

On October 20, Owners appointed the firm of Anacopa S.A. as protective agents to assist Owners in determining the reasons for the delays to the KM IMABARI. In the evening of October 21, Anacopa wrote to Owners, with a copy to Steven Reynolds at RSUSA,[12] stating in part:

> *We have contacted everyone we know who is in the business of mining, exporting, transporting, shipping, selling or storing minerals in this area to find out where and what quantity of minerals are available to be loaded in your vessel. We cannot find any cargo in this area that is for RSUSA, Steven Reynolds or your vessel.*
>
> * * *
>
> *Your vessel is waiting for cargo. We are unable to located [sic] any cargo within the 25 kilometers of Manzanillo for you [sic] vessel. If there is a cargo than [sic] Mr. Reynolds is the only person who knows about it.*

Owners also sent the full text of the Anacopa letter to ISC together with the following requests:

> 1. *PAY THE DETENTION AS PER ATTACHED STATEMENT IMMLY. THE CLAIM AMMOUNT [sic] IS SUBJECT TO OWNRS ADJUSTMENT AND/OR EXTENTION. [sic]*
> 2. *CLEARLY ADVISE IF THE CONTRACTED 70200MT CARGO IS READY/AVAILABLE TO LOAD. IF NOT, HOW MUCH OF IT IS READY/AVAILABLE TO LOAD, AND WHEN THE FULL CARGO WILL BE READY/AVAILABLE TO LOAD, AND*
> 3. *ADVISE THE BERTHING SCHEDULE AND HOW MANY DAYS ESTIMATELY TO FINISH LOADING.*

On October 22, ISC relayed an October 30 message from RSUSA stating that the cargo was ready, but that the KM IMABARI loading prospects were dependent upon

---

[11] Owners' Exhibit 15 at pp. 6-7.
[12] Owners' Exhibit 17 at p. 3.

the pre-arranged berthing schedules of other vessels.[13] Also, on October 22, Owners

wrote to RSUSA, via ISC, demanding Charterers' immediate and unequivocal

assurances that the cargo would be supplied promptly and that Charterers

acknowledge and agree to pay the outstanding detention by no later than October 26.

Owners also stated that if Charterers should fail to give such assurances by October 24,

they would treat the charter as repudiated. Additional requests for adequate assurance

by November 4, 2009 were again made by Owners and their counsel on November 3,

2009 and November 4, 2009, respectively.

On October 23, Mr. Reynolds wrote to Owners, addressing points made in

Anacopa's letter of October 21 as follows:[14]

> *The opening line in our. Fixture Note state* [sic]
> *ALL TERMS/CONDITIONS INCLUDING NAMES OF CHARTERERS*
> *OWNERS TO REMAIN ABSOLUTELY PRIVATE AND CONFIDENTIAL*
> *AND NOT TO BE DIVULGED TO ANY THIRD PARTY. The very fact that*
> *you hired a protective agent without our consent is a breach of our contract.*

The message also contained attacks on the integrity of Mr. Casey, a director of

Anacopa, and a demand that Owners dismiss their protective agents.

Owners responded on October 23 disagreeing with Charterers' position on the

right to appoint a protective agent, but "in light of the past history between Anacopa

and yourselves [RSUSA], and as a gesture of good faith," Owners agreed to terminate

their relationship with the agents.

---

[13] Owners' Exhibit 17 at p. 2 shows that the KM IMABARI was the only vessel remaining at the anchorage.
[14] Owners' Exhibit 19 at p. 1.

On October 27, Charterers advised that the vessel would berth on October 31, blaming the delays on prevailing weather conditions and causes beyond their control. At this time, Charterers also repeated an earlier suggestion that the Master come ashore to be shown the accumulated cargo to be loaded on board the KM IMABARI.

On October 30, Mexshipping confirmed that the vessel was in line to berth on November 2, subject to Shippers' confirmation, which, however, did not materialize. The next indication was that loading would start on November 3 after the cargo had been cleared by Customs. Once again, the berthing orders failed to come through, prompting Owners to have their attorneys write to RSUSA. At this time, since Owners were claiming detention damages of approximately $750,000, counsel presented an ultimatum that in the absence of receiving adequate assurances by close of business on November 4, Owners would consider Charterers to have repudiated the charter. On November 4, Charterers acknowledged the communication from BlankRome and stated:[15]

> *Please direct all communications to MFB Solucators [sic] att Mr. Stuart Blaxell and Royston Razor Att Mr. Jim Hunter and in New York the firm FREEHALL [sic]. We continue to reserve our full rights and deny each and every accusation contained in your letter as false. It is Panocean [sic] who is in beach [sic] and violation and we will spare no expense defending our reputation and honor for the extreme breach not inclusive of damages and loss.*

On November 5, ISC relayed the following message to Owners:[16]

> *As per communication this morning from Mr. Steven Reynolds, RSUSA has instructed ISC to advise Pan Oceanic that RSUSA's legal team will communicate*

---

[15] Owners' Exhibit 31 at p. 5.
[16] Owners' Exhibit 32 at p. 1.

*directly with your attorney, Mr. Thomas H. Belknap, Jr. The legal team will address his letter, dated November 4, 2009, on your behalf addressed to RSUSA.*

*Until this letter is addressed, ISC has been instructed to stand down, however, ISC will channel any written communications from Pan Oceanic.*

In the absence of any further communication from Charterers, Owners' counsel notified RSUSA on November 5 that by virtue of Charterers' breach, Owners considered the charter terminated. The vessel was then withdrawn from Charterers' service and Owners proceeded to find substitute employment in mitigation of their damages.

On November 10, Pan Oceanic fixed the vessel to Swiss Marine Services S.A. for a cargo of iron ore pellets from Manzanillo to Rizhao (China) at a rate of $24.75 per ton with laydays of November 5-10.

## CLAIMS

Owners are claiming damages in the amount of $1,499,449.06, as a result of Charterers' breach of the charter. Specifically, the claim consists of: (a) freight differential of $361,915.33; (b) detention of $983,804.00;[17] (c) bottom cleaning of $15,000.00; and (d) lost time/over-consumption of fuel of $138,729.73. Owners also claim interest at the rate of 6% p.a. compounded quarterly from the time of the breach until the date of payment, as well as legal fees and the costs of this arbitration.

Charterers reject Owners' claims and their entitlement to damages, arguing that Pan Oceanic had repudiated the charter party "for no factual or legal reasons." In turn,

[17] Calculation at $24,595.10; in the alternative, the detention should be calculated at the agreed demurrage rate of $20,000.

RSUSA claim a total of $67,460,000.00[18] comprised of: (a) lost profits for the non-performed voyage in the sum of $2,310,000.00; (b) lost profits from the cancellation of a Contract of Affreightment (with Pacific Coast Minerals S.A. de C.V.), triggered by Owners' repudiation of the single voyage charter, in the sum of $45,000,000.00; (c) $150,000.00 allowance for fees and costs; and (d) $20,000,000.00 in punitive damages.

Since the claims for attorneys' fees and costs had not been substantiated by either party, the panel requested better particulars on June 2, 2010. On the same day, Owners' counsel submitted full details in support of their claim for $36,307.67, also confirming that full payment had been received from the Owners. Charterers responded on June 2 stating that their submission would be made by June 7. On June 3, Charterers advised the panel that the claim for fees and costs had been reduced to $20,000, for which supports would be submitted by June 7, 2010 at the latest. As of the date of this award, no documentary supports or other evidence in connection with fees and costs had been received by the panel.

## DISCUSSION AND DECISION

Both parties have argued that the other breached the charter party, giving rise to substantial damages.

Although Owners initiated this arbitration, the panel has decided to address Charterers' claims and contentions first.

---

[18] P. 10 of Charterers' Main Response and Counterclaim.

**Breach of Contract**

There appear to be two elements on which Charterers rely for their contention:
(a) Owners' alleged breach of the confidentiality agreement and (b) the fact that Owners
decided to withdraw the vessel from Charterers' service and seek substitute
employment.

(a) On October 23, RSUSA's CEO stated that "the very fact that you hired a
protective agent without our [Charterers'] consent is a breach of our contract."[19] On
October 25, ISC relayed a second message authorized by Mr. Reynolds, which read:[20]

> *Charterers wish to take this opportunity to thank owners for the prompt response
> and understanding in the matter of the particular protecting agent.
> Suffice to say that charterers are not disputing owners [sic] right to appoint in
> addition to charterers [sic] agent, a protecting agent.*

The effect of this explanatory second message was to rescind the first. Thus, the point is
now moot and the panel need not address it.

(b) On November 5, Charterers wrote to Owners' counsel:

> *RSUSA expressly maintains that fixture in all its terms. Should Owners choose
> to sail away, they will themselves have repudiated the charter party and will be
> held liable in damages for having done so.*

Owners' counsel responded on the following day:[21]

> *We note your statement that you now have a cargo to load, but again you
> offer no specifics or substantiation. In any event it is too little, too late. You
> were well aware over a week ago that Owner was very concerned about the
> developing situation, and we sent you notice on November 4, 2009 seeking
> adequate assurances of your performance under the Charter, to which you failed*

---

[19] Supra.
[20] Owners' Exhibit 21 at p. 1.
[21] Owners' Exhibit 34 at p. 2.

*to provide a suitable response. Owner consequently was entitled to cancel the Charter, and it properly did so by our letter of yesterday.*

It is an accepted maxim that a charterer's duty to provide a cargo is central to the voyage charter concept. It can be safely said that the charterer's obligation to provide a cargo is absolute.[22] Voyage Charters states[23] that the . . .

*. . . owner may be entitled to consider the charter terminated if the charterer demonstrates by its statements or conduct that it will not or cannot perform. In such circumstances, the owner is permitted to conclude there has been an anticipatory repudiation of the charter.[24] A repudiation by the charterer will not only excuse the owner from performance, but may give rise to a claim for damages. If the owner has reasonable grounds for believing that the charterer is not going to provide a cargo, the owner is entitled to demand an assurance of performance by the charterer, the absence of which may be treated by the owner as a repudiation.[25]*

The doctrine of adequate assurance is grounded in the principle that a party to a contract is entitled to reasonable comfort that its contract partner is both willing and able to carry out its obligations. As referenced in the footnotes that follow, the consequences for a party's failure to give such assurances are stated in Section 251, paragraphs (1) and (2) of the Restatement (Second) of Contracts, as follows:

§251. *When A Failure To Give Assurance May be Treated As A Repudiation.*
*(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the oblige a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.*
*(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.*

---

[22] Voyage Charters, 3rd ed, p. 86, par. 7.41.

[23] Ibid at 7.43.

[24]See generally Restatement, Second, Contracts, §§250-257.

[25]Restatement, Second, Contracts.

This doctrine has also been relied upon by arbitrators *i.a.* in the cases of the OPAL STAR[26] and the FOREST ENTERPRISE.[27]

The text continues with the following commentaries:

> **7.44**  . . . *the charterer's failure to nominate a loading berth may demonstrate an intention not to perform which would justify termination of the venture by the owner. This would be especially true if the owner had made one or more timely requests to the charterer for a berth nomination and none was provided. The burden of proof is on the owner, however, and great care must always be exercised before walking away from a contract on the grounds of an anticipatory repudiation. Generally, a mere expression of doubt by the charterer as to its ability or willingness to load the cargo may not constitute a repudiation, although depending on the circumstances such an expression may ultimately rise to the level of a repudiation.*[28]
>
> **7.45**  *The test which has evolved in New York arbitration to resolve this difficulty is simply one of reasonableness. At what point in time would a reasonable owner conclude that the charterer is not going to perform? The reasonable man test, of course, must be applied on a case-by-case basis, taking into account all of the circumstances. There will be situations where the charterer's delay or non-performance may be excused by reason of force majeure or commercial frustration. In the absence of any such valid excuse for non-performance, the owner ordinarily will be entitled to recover demurrage or detention damages for waiting time and consequential damages arising from the charterer's breach and/or such damages as may be allowed an owner when the charterer fails to perform.*[29]

In the SAN GEORGE,[30] the arbitrators held that in the event the charterer breaches its duty to supply a cargo, the owner will be entitled to recover any accrued demurrage or, alternatively, detention as well as consequential damages and/or such damages as may be allowed an owner when the charterer fails to perform.

---

[26] SMA 3650 (2000).

[27] SMA 3743 (2002).

[28] Restatement, Second, Contracts §250.

[29] THE ISLAND GEM, SMA 2560 (1989), the charterer's failure to give loading instructions was held to be a repudiation of the charter; THE ULYSSES, SMA 1751 (1982), the owner was held to be entitled to consider the charter at an end after waiting 23 days for cargo. In that case, the charterer had promised to pay or provide security for accrued demurrage, but failed to do so.

[30] SMA 2564 (1989).

Based upon the circumstances of this case and the arbitral precedent, the panel finds that Charterers breached the charter and, therefore, are not entitled to their claim for lost profits under the non-performed voyage by the KM IMABARI. We further find that Charterers' failure to provide the requested adequate assurance allowed Owners to treat the charter party as having been repudiated and to withdraw the vessel.

With respect to the cancellation of the COA with Pacific Coast Minerals S.A. de C.V. (PCM), Charterers have failed to produce credible evidence for this claim of $45 million. The bundle of unnumbered attachments to the March 7, 2010 unsigned letter entitled "Charterers' Main Response and Counterclaim" includes a three-page document dated September 17, 2009 on PCM stationery, signed by Steven C. Reynolds, as Chief Executive Officer, Reynolds Shipping USA, LLC, and Jorge Garcia, as Contract Manager, Pacific Coast Minerals S.A. (RSUSA, LLC). Since Mr. Reynolds is also the CEO of RSUSA, LLC, the panel is not prepared to accept this letter as *prima facie* evidence of an independent, arms-length transaction.[31]

Any arguments raised by Charterers but not specifically addressed by the panel in its decision, were carefully considered but dismissed *sub silentio*.

Having denied Charterers' claim for the lost profits of the non-performed voyage for the KM IMABARI and the COA with PCM, the panel finds no basis or reason to address Charterers' claim for punitive damages.

\* \* \* \* \*

---

[31] Owners' Exhibit 44, downloaded from the PCM website, identifies the company as owned by the SCR Trust Family and as a sister company of *i.a.* RSUSA, LLC and Neptune Shipping.

The panel now turns to the various claims submitted by Owners as the result of RSUSA's breach of the September 9, 2009 charter for the KM IMABARI and their failure to provide a cargo.

**Freight Differential**

In mitigation, Owners were able to arrange for a fixture from Manzanillo to China, however, at the lower rate of $24.75 per m/t (compared to $29.75 per m/t under the RSUSA charter). Owners' claim statement of December 30, 2009[32] established the net freight loss at $361,915.33, with which we agree. The panel awards this amount together with interest.

**Detention**

Pan Oceanic have calculated this claim at $983,804.00[33] for the period 0001 on October 2 to 0001 on November 11, 2009, or 40 days. Owners used as daily value an assessment rate of $23,386.10[34] together with vessel's daily bunker cost of $1,209.00,[35] or $24,595.10. In their main brief of January 19, 2010, Owners had stated that, in the alternative, detention should be calculated based on the contractually agreed demurrage rate of $20,000.[36]

The arbitrators have carefully considered the question of the daily detention value and decided that the waiting time should be calculated at the daily demurrage

---

[32] Owners' Exhibit 41 at p. 1.
[33] Owners' Exhibit 41 at p. 1.
[34] Based upon the Baltic Exchange Panamax Index applicable to this vessel's size for the relevant period (see Owners' Exhibit 41 at p. 2).
[35] Based upon 2.6 m/t per day at $465 per m/t as stated in the underlying time charter.
[36] At p. 21.

rate of $20,000. Based upon this ruling, we award to Owners the sum of $800,000 together with interest from November 11, 2009 to the date of this award.

**Bottom Cleaning**

As a result of the prolonged stay at Manzanillo, Owners contend that the vessel's bottom became fouled with marine growth which not only adversely affected her speed and fuel consumption, but would require the bottom to be cleaned at some future date. Rather than paid invoices, Owners merely presented an unsupported estimate of $15,000 for such cleaning. Absent persuasive evidence that Owners were required and did pay to have the ship's bottom cleaned and that such cleaning was made necessary by the vessel's prolonged stay in Manzanillo, the panel is obliged to deny this claim.

**Time Loss and Over-Consumption**

Owners claim $138,729.73 for time lost and over-consumption because of the bottom fouling.[37] Here again, Owners have not presented persuasive evidence to support their time lost and excess consumption calculations. Both calculations are merely predicated on a comparison of the ship's actual performance[38] against the speed and consumption warranties contained in the head time charter party. We have seen no evidence of the ship's performance prior to arriving Manzanillo nor what wind and sea conditions were experienced during the mitigation voyage. Absent such proof, the Owners' calculations do not rise to the level of proof required to justify an award. More importantly, if Owners thought the bottom had become fouled, the proper remedy was

---

[37] Owners' Exhibit 41 at p. 3 and Exhibit 43 at pp. 1-5.
[38] As stated by Owners.

to have the ship cleaned prior to departing Manzanillo on the mitigation voyage. That obviously did not take place and we are, therefore, required to also deny this claim.

## INTEREST

The panel awards interest at the weighted average Prime Lending Rate as published by the Federal Reserve for the periods due; *i.e.*, 3.25% p.a. for the period from November 11, 2009 to the date of this award.

## FEES AND COSTS

Both parties have claimed for attorneys' fees and costs of this arbitration. In line with the prevailing custom and practice in New York and the agreement of the parties requesting reimbursement for attorneys' fees and costs, the panel makes an award of $36,307.67 for Owners' legal fees and costs.

The panel's fees and expenses are contained in the attached Appendix A, which forms an integral part of this award. Payment is to be made in accordance with the terms contained therein from the escrow account established with the SMA. Liability for the panel's fees is a joint and several obligation of both parties.

## AWARD

Charterers are directed to pay Owners the amount of US $ 1,246,482.76 arrived at as follows:

- Freight differential          US $   361,915.33

  Interest thereon             7,508.50

- Detention                 800,000.00

  Interest thereon            16,597.26

- Attorneys' fees and costs      36,307.67

- Reimbursement of arbitrators' fees paid
  on Charterers' behalf          24,154.00

                                 -----------------

        TOTAL DUE PAN OCEANIC     US $   1,246,482.76

                                 ================

Interest at the rate of 3.25% p.a. shall continue to accrue on the amount awarded from the date of this award until payment in full has been received or the award has been reduced to judgment, whichever first occurs.

The Arbitration Clause provides that this award may be made a rule of the court.

_____
A.J. Siciliano

_____
Klaus C. J. Mordhorst

_____
Manfred W. Arnold

New York, New York
July 2, 2009

## APPENDIX A

The arbitrators' fees and expenses amount to $24,154, which are to be borne in full by Charterers. Payments to the arbitrators are to be made within 15 days from the date of this award.

In the first instance, payment is to be made from the escrow account maintained by the SMA, which was funded by Pan Oceanic. After full payment has been made in the amounts of $7,874 to K.C.J. Mordhorst, $6,300 to A.J. Siciliano and $9,980 to M.W. Arnold, Owners are entitled to a claimover against Charterers, and we have so provided for this in our award. The remaining balance, together with accrued interest, is to be returned promptly to Owners or their counsel.

The arbitrators' fees are a joint and several obligation of both parties.

In the Matter of the Arbitration
            between
PAN OCEANIC MARITIME, INC.,
as Disponent Owners of the KM IMABARI
            and
RSUSA, LLC,
as Charterers

New York, New York
July 2, 2010